No. 29,686.

JOHN R. BRINKLEY, *Appellant,* v. J. F. HASSIG et al., as Members of THE STATE BOARD OF MEDICAL REGISTRATION AND EXAMINATION, etc., *Appellees.*

(289 Pac. 64.)

Opinion filed June 13, 1930.

*Fred S. Jackson* and *James E. Smith,* both of Topeka, for the appellant.

*William A. Smith,* attorney-general, and *W. C. Ralston,* assistant attorney-general, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one by plaintiff to enjoin the state board of medical examination and registration from holding a hearing on the subject of revocation of plaintiff's license to practice medicine and surgery. A demurrer to the petition was sustained, and plaintiff appeals.

The board of medical examination and registration consists of seven members appointed by the governor by and with the consent of the senate. Each member must be a physician in good standing in his profession, who received a degree of doctor of medicine from a reputable college or university not less than six years previous to appointment as a member of the board. Each member is required to take and subscribe the oath prescribed for state officers, and the oath is filed with the secretary of state. The board is organized by selection of a member as president and another member as secretary, and is required to hold regular meetings on stated days of the year in such of the chief cities of the state as the board may designate. The board has a common seal, and has power to formulate rules to govern its action. The president and secretary have power to administer oaths pertaining to all matters relating to the board's business. The board is required to keep a record of its proceedings and a register of applicants for license, and the books and register of the board are *prima facie* evidence of all matters recorded thereon. (R. S. Supp. 74-1001.)

All persons intending to practice medicine or surgery are required to apply to the board for license to practice. The application must be in writing, and must be accompanied with proof of moral character and satisfactory evidence of study for a prescribed time. All applicants must submit to an examination of a character to test qualification to practice medicine and surgery, except that graduates of certain medical institutions and holders of licenses from other states whose standards are as high as those of this state, may, in the discretion of the board, be admitted without examination. The statute further provides as follows:

"The board may refuse to grant a certificate to any person guilty of felony or gross immorality or addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery, and may, after notice and hearing, revoke the certificate for like cause, or for malpractice, or unprofessional conduct." (R. S. Supp. 65-1001.)

In the year 1916 the plaintiff, John Richard Brinkley, of Milford, Kan., was granted a license to practice medicine and surgery in Kansas, under the reciprocity provision of the law, and the license is still in effect. On April 28, 1930, a verified complaint was filed with the board, stating causes for revocation of the license. On April 29 the licensee was served with notice, signed by the president and secretary and under seal of the board, that the complaint had been filed, and that a hearing would be had on the complaint at a specified place in Topeka on June 17, 1930, at 2 p. m., which is the date of a regular meeting of the board. The notice informed the licensee he might appear before the board at the hearing, present his defense to the charges contained in the complaint, and be represented by counsel if he so desired. A copy of the complaint was attached to the notice. On May 7, 1930, this action was commenced, to prevent the board from holding any hearing to determine the truth of the charges contained in the complaint.

The petition did not allege that the statute was lame in regard to specifying grounds for revocation of license, and it was not. Neither did the petition allege that the complaint did not state grounds for revocation of license prescribed by the statute. The complaint was by no means confined to challenge of the success of the licensee's gland operation, the claimed result of which is that dotards having desire without capability may cease to sorrow as do those without hope, and the complaint was not that the licensee is a quack of the common, vulgar type. Considered as a whole, the gravamen of the complaint is that, being an empiric without moral sense, and having acted according to the ethical standards of an impostor, the licensee has perfected and organized charlatanism until it is capable of preying on human weakness, ignorance and credulity to an extent quite beyond the invention of the humble mountebank who has heretofore practiced his pretensions under the guise of practicing medicine and surgery. The petition for injunction denied the charges contained in the complaint, but the ground for injunction was, the board has no power to hold a hearing to find out whether the charges are true or false.

There was no allegation in the petition that the words "may, after notice and hearing, revoke the certificate," were insufficient to authorize action by the board, and they are not. There was no allegation that the board does not have rules relating to notice and

hearing, and the court holds the statute authorizes the board to proceed according to its own rules, or in the absence of regularly adopted rules, to proceed according to such fair and reasonable methods as will accomplish the purpose of the statute, having due regard to the interest of the accused and to the interest of the public.

Paragraph VI of the petition alleged the board is threatening to and will proceed without giving plaintiff an opportunity to be heard. The allegation was contradicted by the notice served on plaintiff, a copy of which was attached to the petition, and in the absence of specification of some kind of deprivation of opportunity, the allegation gave the court no information on which it might grant an injunction.

Paragraph VII of the petition alleged the statute confers on the members of the board arbitrary and capricious power to revoke plaintiff's license by methods other than those established for the administration of justice. The specification following the allegation was defect of power, and the horrific words added nothing to the strength of the petition.

Paragraph XI of the petition alleged there is no provision of law whereby the charges made in the complaint may be reëxamined so that plaintiff would be permitted to present his defense, which is true. Due process does not require two or three examinations of the merits of charges, and plaintiff must present his defense to the board. The paragraph also alleged the statute confers no right of appeal to another tribunal or court in which truth of the charges may be reëxamined, which is true. The courts are always open, not to reëxamine merits, but to ascertain whether the accused had notice and opportunity to be heard, and whether the board acted fairly and honestly within the scope of its authority; and that satisfies the requirement of due process under the state and federal constitutions.

Other general allegations of the petition may be passed by because they are plainly in the nature of introductions and complements to and deductions from allegations of specific shortcomings of the statute. The specific allegations are that the statute does not authorize the board to issue subpœnas for witnesses, or to enforce the attendance of witnesses, or to compel production of books, documents and records; and that there is no provision in the law for taking depositions to be used at the hearing. These allegations are true, and because the proceedings before the board are not ju-

dicial, the enumerated aids to judicial action may not be implied. Plaintiff's supposed plight, in view of the omissions from the statute, is described in the petition.

The injunction was properly denied because plaintiff's petition did not name any witness residing in the United States, or any European *savant,* whom he desires to examine; did not state what testimony any witness would give relative to any charge contained in the complaint; and did not specify any book, document or record pertaining to the inquiry by the board which plaintiff wishes produced. We have here a complaint that, by virtue of a license obtained by fraud, the impostor holding it is fleecing the defective, the ailing, the gullible, and the chronic medicine takers who are moved by suggestion, and is scandalizing the medical profession and exposing it to contempt and ridicule. The board has power to conduct a hearing regarding this matter, and the court was not obliged to stay the hand of the board without some statement of what somebody would say tending to clear the license holder of the charges preferred against him. The judgment will not be affirmed, however, on that ground. The court holds the statute does not violate either the constitution of the United States or the constitution of the state of Kansas.

Plaintiff's contentions are based on certain fundamental postulates. One is that right to keep his license is a property right. What he has is a privilege of value to him, but there is no need to tarry over definitions. So far as this court knows, Doctor Brinkley may be a practitioner having the highest professional and ethical ideals. He may be a pioneer in advance of the medical and surgical science of his time. He may be a benefactor of mankind, and entitled to overflowing reward for his services. All the court has before it is the complaint of the board and the petition for injunction. No presumption of either guilt or innocence may be indulged. The complaint in effect states that in early days of Doctor Brinkley's practice in this state he was a convicted bootlegger, and roamed from state to state for license to practice. The petition states that he has expended a quarter of a million dollars in establishing and equipping his hospital at Milford. It will be assumed his interest in keeping a license, by virtue of which he may continue his thriving business, is an important matter to him, and the court holds he cannot be deprived of his license without due process of law.

Another fundamental assumption of plaintiff is that the word

"hearing" as used in the statute means "trial." A trial is a judicial examination of issues, whether of law or fact, in an action (R. S. 60-2901), and an action is an ordinary proceeding in a court (R. S. 60-104). If the legislature had intended that a proceeding to revoke a physician's license should take the form of a trial, presumably the statute would have so declared. The board is not a judicial tribunal, performs no judicial function, such boards never have been classed with judicial tribunals, and due process of law does not require a trial. The court disposed of this subject in the case of *Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247.

Recognizing the conclusiveness of the decision in the Meffert case, plaintiff protests he does not claim the board is a court, and does not claim the board is clothed with judicial power; but after the disclaimer, plaintiff proceeds to argue the board is a cipher unless it has enumerated attributes of a judicial tribunal, and not only that, but the attributes of a judicial tribunal acting under the constitutional guaranty relating to prosecution for crime.

"In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of witnesses in his behalf, . . ." (Bill of Rights, Kansas Constitution, § 10.)

In the Meffert case it was expressly held a proceeding to revoke a physician's license is not criminal in its nature, and the purpose is not punishment of the delinquent. The purpose is to protect and promote the public welfare by excluding from the profession those licensees who will not or cannot measure up to the prescribed standards of professional probity.

The board is an administrative body created under the police power of the state. A constitutional framework and a body of laws will not alone make government work; and in this country, as well as in England (see "The Task of Administrative Law," by Felix Frankfurter, 75 U. of Pa. Law Review, 614 [1927]), the increasing complexity of modern life caused the law to develop along a path called administrative law:

"Despite our best federalist traditions, it is no longer possible to divide the provinces of the executive, judicial and legislative into separate water-tight compartments. With this change has come the abandonment of the age-old subjection of all questions to controlling decision by the judiciary, at least where there is need for speedy and flexible decision and where public interest may be regarded in a manner impossible between two parties to a litigation.

Thus administrative law has arisen." (Administrative Standards, Jane Perry Clark, 44 Political Science Quarterly, 193.)

The history of due process is well sketched in Mott's book "Due Process of Law" (1926). In chapter XIII, on "Notice and Hearing," and chapter XIV, on "Due Process and Settled Usage," the contest in this country between administrative law and "judiciocracy" from the days when due process required trial by jury to the present, is described, the decisions are cited, and the subject need not be treated here. The following quotation is pertinent:

"In the eighties, a far-reaching change came over the supreme court. . . . This changed attitude came just at the period when the activities of the federal government were undergoing their greatest expansion and when a tremendous economic revolution was taking place in the industrial life of the community. Free land had practically disappeared, the old frontier was gone, the industrial revolution had taken place, and pragmatic philosophy was just coming into its own. These and other influences were destined to work a change in the judicial history of America fully as significant as that wrought in its economic development. The court gradually spelled the death sentence of the old formalistic doctrines, and a broader, more potent viewpoint emerged. . . .

"The keynote of the new attitude as regards procedure was struck in the important case of Hurtado v. California, 110 U. S. 516 (1884)." (pp. 245, 246.)

The ruling in the Hurtado case was that due process under the fourteenth amendment to the constitution of the United States did not require prosecution by indictment by a grand jury in a murder case. The essence of the opinion by Justice Matthews was that the purpose of the constitutional requirement of due process was to exclude arbitrary and capricious governmental action; that due process does not require adherence to established forms and modes of attainment; and that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of legislative power in furtherance of the public good, is due process, if the fundamentals of liberty and justice are preserved. As indicating what those fundamentals are, Webster's famous definition of "law of the land," in his discussion of due process, was quoted:

"By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." (Dartmouth College v. Woodward, 4 Wheaton, 518, 581.)

Over and over again the supreme court of the United States has declared that in administrative proceedings due process does not

require particular form or method of procedure, but that its requirements are satisfied if the person affected by the proceeding has reasonable notice and reasonable opportunity to be heard and to present his defense, due regard being had to the nature of the proceedings and the character of the rights which may be affected. A recent declaration to this effect may be found in the opinion of Mr. Justice Stone in the case of *Hurwitz v. North,* 271 U. S. 40 (1926), which involved due process of law in the revocation of a physician's license under the law of Missouri.

In the opinion of the supreme court of the United States in the case of *Brinkerhoff-Faris Trust & Savings Co. v. Hill,* filed June 2, 1930, Mr. Justice Brandeis, speaking for the court, said:

"Our present concern is solely with the question whether the plaintiff has been accorded due process in the primary sense—whether it has had an opportunity to present its case and be heard in its support."

With the exception of a sporadic case to be noted later, no court has ever declared that opportunity to present defense and be heard in its support requires the adjective element of compulsory process.

The history of testimonial compulsion, from the time when the jury were witnesses, and a witness in the modern sense was liable for maintenance, to the time when duty to give testimony became a duty to the state, enforceable by the judicial branch of the government, is traced in 5 Wigmore on Evidence, §§ 2190-2197. In this state power to enforce attendance of witnesses could not be conferred on the board of medical examination and registration, because it does not exercise judicial power. The legislature might have provided that depositions might be taken in the manner provided by the civil code, but following the example of the state of Ohio and other states, the legislature did not do so.

In the case of *Jewell v. McCann,* 95 Ohio St. 191 (1917), it was urged that the following statute did not afford due process of law:

"SEC. 1275. The state medical board may refuse to grant a certificate to a person guilty of fraud in passing the examination, or at any time guilty of felony or gross immorality, or addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery. Upon notice and hearing, the board, by a vote of not less than five members, may revoke a certificate for like cause or causes.

"SEC. 1276. An appeal may be taken from the action of the state medical board refusing to grant, revoking or suspending a certificate, for the causes named in the preceding section, to the governor and attorney-general, whose decision affirming or overruling the action of the state board shall be final." (p. 192.)

In a *per curiam* opinion the court said:

"The only authority possessed by the state medical board in the matter under consideration, at the time it attempted to take the action sought to be enjoined in this proceeding, was conferred by the sections above quoted. No provision whatever was made or then existed whereby the attendance of witnesses could be required or their testimony procured, nor was any procedure provided whereby the rights of the holders of such a certificate to engage in the practice of medicine could be protected and safeguarded. Although the statutes authorized the revocation of such certificate 'upon notice and hearing,' the board was not vested with any of the powers essential to the conduct of the trial or hearing. No process was authorized and no method or means for such hearing prescribed or provided, nor is an opportunity to be heard furnished by the provisions of section 1276 authorizing an appeal to an officer or officers in whom is vested no authority to subpœna witnesses, enforce attendance, compel the giving of testimony, or the production of necessary books, records and documentary evidence.

"The statutes in question did not provide the plaintiff in error due process of law, and are therefore invalid." (p. 193.)

The effect of this opinion is not impaired by the fact that no member of the court stood responsible for its formulation. The decision of this court in the Meffert case was affirmed by the supreme court of the United States in a *per curiam* opinion. (*Meffert v. Packer*, 195 U. S. 625 [1904].) The distinction between the two opinions consists in the fact that the supreme court of the United States supported its decision by citation of decided cases:

"*Hawker v. New York,* 170 U. S. 189; *Dent v. West Virginia,* 129 U. S. 114; *Reetz v. Michigan,* 188 U. S. 505; *Gray v. Connecticut,* 159 U. S. 574; case below, 66 Kan. 710." (p. 625.)

The supreme court of Ohio was not able to do this. The decision involved exercise of the highest judicial function known to constitutional government, refusal to execute a statute enacted by the legislature in the interest of the public welfare. The court ventured no reasons of its own for its action, for information of the litigants, or instruction of the legislature, or enlightenment of the bench and bar of the country. The decision is authority for nothing but the fact that it was rendered, and this court declines to follow it.

In the case of *Hurwitz v. North,* 271 U. S. 40, the statute under consideration did not authorize the medical board to issue subpœnas. It did authorize the taking of depositions of witnesses who did not voluntarily appear, before officers empowered to compel attendance and the giving of testimony. Depositions when taken might be read before the board. It was held the procedure gave ample opportunity to make defense. There was no intimation that

omission of the provision relating to taking depositions with the incident of compulsory process would have impaired the law. In a comment on the decision, Dr. Ernest Freund, an eminent authority on due process, raised the question whether the decision might not confuse the law, because a decision sustaining a statute by reason of nonexistence of alleged defects, does not require the same consideration as if defects existed and the court were obliged to declare the effect on the statute. This court is of the opinion that if confusion results, it will not be because of the decision itself; but the following portions of the comment are pertinent here:

"A saving circumstance will, however, be found in the rule, so far as it is recognized, that a person cannot rely upon a constitutional defect by which he is not prejudiced. In a revocation proceeding it will be rare indeed that the person charged has to rely for his defense upon the testimony of unwilling witnesses; normally it is the testimony on behalf of the state that may stand in need of compulsory process, and if it does, the case for the state will be apt to be weak. Except in cases of investigations, it is the opportunity to be heard and to hear the evidence on the other side, not the right to compulsory testimony, that counts in administrative proceedings." (21 Ill. Law Review, 493 [1927].)

A person contending for American citizenship and all that American citizenship may mean, against a deportation order, is not deprived of due process of law because he may not have compulsory process for witnesses in his behalf. (*Low Wah Suey v. Backus*, 225 U. S. 460.) The private interest involved in exclusion of an undesirable from practice of medicine and surgery, is not so different in kind that opportunity to hear and to be heard must be supplemented by compulsory process.

In discussing proceedings for exclusion from practice of a profession, great emphasis is usually placed on the private interest rather than on the public interest, and much judicial sympathy has been expended because of the humiliation and shame a professional man must feel if his license be revoked. If charges of the kind contained in the complaint to the board should be established against one professing to be a physician and surgeon, his emotions would probably be of the same refined quality as the emotions of a dance-hall keeper whose place is summarily closed because he was running it for assignation purposes, or the emotions of one against whom the postmaster general issues a fraud order on evidence satisfactory to himself of misuse of the mail service.

The statute under consideration is a public welfare statute. It

was made for action, and not merely to furnish grist for the judicial mill. While a full and fair hearing is mandatory, the character of hearing is not measured by standards of judicial procedure, and the licensee may present the testimony of his voluntary witnesses, so far as he desires to do so, by affidavit made before and duly authenticated by any officer authorized to take depositions. The requirement of hearing makes it incumbent on the board to receive such testimony and give it the same consideration it would have if taken by deposition without appearance of the adverse party. In the case of *Robertson v. Heath*, 132 Ga. 310, the court had under consideration the admission of affidavits, *ex necessitate*, in a habeas corpus proceeding. In the opinion by Lumpkin, J., it was said:

"It may be that a witness is beyond seas, or inaccessible, or for other reason cannot be put upon the stand. The writ is a speedy writ. The proceeding is summary in its nature. It is a judicial proceeding, and to be conducted in an orderly manner as such. But it is not exactly a lawsuit in the ordinary sense of the term. [Citation.] To delay its hearing until a witness absent from the state or the country can return, or until interrogatories can be prepared, notice given, cross-questions propounded in writing, and commission forwarded to a distant state or country and there formally executed, might require so much time that the hearing under the writ would be unreasonably delayed. It may be necessary to admit an affidavit, or, in default of it, to exclude much needed light altogether. Or there may be other circumstances rendering the use of affidavits proper." (p. 313.)

The court is of the opinion the statute is not rendered nugatory by the fact that the legislature did not provide compulsory process for the factitious case in which successful defense might depend on testimony of unwilling, hostile and prejudiced witnesses not produced by the complainant for cross-examination at the hearing.

It may be necessary for the board to receive affidavits in support of the complaint. Witnesses should be produced for cross-examination if it be practicable to do so, but if it should become necessary to resort to affidavits, due process requires that the licensee should be afforded opportunity to inspect them and to procure counter testimony. If affidavits should be used in support of the complaint, reason for nonattendance of the witnesses should appear, so that in case of judicial review the fairness of the proceeding may be disclosed by the board's record.

The court is of the opinion that when the statute is interpreted in the manner indicated, it does not deprive a licensee against whom complaint is made of due process of law, and the judgment of the district court is affirmed.